# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

MARCEL WHITE,

        Plaintiff,

vs.                                    Case No. 3:14-cv-552-J-32PDB

CITY OF JACKSONVILLE,

        Defendant.

## ORDER

Plaintiff Marcel White is an African-American firefighter who has worked for the City of Jacksonville's Fire & Rescue Department ("JFRD") since 1994. In this lawsuit, White alleges JFRD discriminated against him based on his race, retaliated against him for making complaints, and harassed him and created a hostile work environment in retaliation for making complaints, all in violation of Title VII and Chapter 760, Florida Statutes.[1] The City moved for summary judgment (Doc. 23), White responded (Doc. 28), and the City filed a reply (Doc. 31).

---

[1] White filed his complaint pro se, but had the assistance of counsel in drafting it. See Doc. 23, Ex. A (plaintiff's deposition) at Tr. 20-21. Counsel later appeared on his behalf and he is currently represented. The title of White's complaint also references the Equal Protection Clause and the Florida Constitution, but there are no counts alleging any infringement of those rights.

## I. Undisputed Facts

JFRD operates as a paramilitary organization, with personnel taking commands from those of higher rank, with the progression (in the order of lowest to highest rank) going from Firefighter to Engineer to Lieutenant to Captain to District Chief to Battalion Chief to Division Chief to Deputy Director/Fire Chief to Director/Fire Chief. Doc. 23, Ex. E, Attach. 2 (JFRD Rules 100.02, 100.04.01). In 2002, after receiving his state inspector's license, White, whose rank is Firefighter, was assigned to JFRD's Fire Prevention Division where he worked as a fire safety inspector. Doc. 23, Ex. A at Tr. 11-15. JFRD's Fire Prevention Division annually inspects over 20,000 commercial properties and places of public assembly to ensure compliance with city fire prevention codes and state law. Doc. 23, Ex. D at ¶¶ 4, 6. The City's Standard Operating Guidelines ("SOG") provide the procedures for conducting fire safety inspections. Consistent with its title, the SOG is intended "to establish guidelines and recommended practices." Doc. 23, Ex. D, Attach. 2 (SOG 439) at § 439.00. The SOG explains that inspectors "shall approach the inspection with the philosophy of educating" the property owner so as to keep the premises free of fire hazards and to promote cooperation, compliance, and understanding. Id. at § 439.02 (7). In the section describing enforcement procedures, inspectors are advised that the "first step" is to notify a party of a violation, and that a warning citation "may be issued." Id. at § 439.09. And, in a circumstance where multiple violations are observed, the inspector

may cite more than one violation, but is advised to "avoid going overboard." Id. at § 439.10.05.  Before 2012, the SOG was interpreted to accord fire safety inspectors some discretion in determining whether to issue a written citation for a violation or to instead follow up informally.  Doc. 31, Ex. J (Kurtis Wilson[2] deposition) at Tr. 33; Doc. 23, Ex. A at Tr. 161-63.

From January 2006 until April of 2013, when he was promoted to District Chief, Kevin Jones, who is also African-American, was a Captain in the Fire Prevention Division.[3]  Doc. 31, Ex. I (Kevin Jones deposition) at Tr. 11.  In February or early March 2012, Jones was assigned the duties of Quality Assurance Officer within the Fire Prevention Division.  Doc. 23, Ex. D at ¶ 17; Doc. 23, Ex. E at ¶ 3.  In that role, Jones was responsible for ensuring the accuracy of data entered into the Fire Prevention Inspection Data system by the Division's thirteen fire safety inspectors.[4]  Doc. 23, Ex. D at ¶¶ 5, 17; Doc. 23, Ex. D, Attach. 8 at 1.  Jones soon determined that inspectors likely were not documenting all observed violations because, based on his

---

[2] Kurtis Wilson was the acting Fire Marshal from October 2011 until September 2012.  In October 2012 he was appointed as the City's Fire Marshal and now serves as the Chief of JFRD.  Doc. 31, Ex. J at Tr. 6; Doc. 23, Ex. E at ¶ 1.

[3] In July 2013, the Mayor appointed Jones to be the Chief of the Fire Prevention Division and City Fire Marshal, a position he still holds.  Doc. 23, Ex. D at ¶ 1.

[4] In the first half of 2012, nine of the fire safety inspectors were African-American, three were white, and one was Hispanic.  Three of the inspectors held the rank of Firefighter; the others were officers.  Doc. 23, Ex. D at ¶ 5.

3

experience, the number of reported violations was very low compared to the number of inspections performed. Doc. 23, Ex. D, Attach. 8 at 1; Doc. 31, Ex. I at Tr. 46, 50, 55. In Jones' view, this would be a serious problem for several reasons, including that documentation gives notice of the violation to the property owner so the owner can correct it; the Fire Marshal may need to review a property's fire safety inspection records while investigating a fire; the records are subject to public record requests and are used by other law enforcement agencies, insurance companies, and members of the public to determine the safety conditions of a property; violations cannot be enforced against a property owner if they are not documented; and state law and City ordinance require that all violations be documented. Doc. 31, Ex. I at Tr. 56; Doc. 23, Ex. D at ¶¶ 8, 10.

On March 12, 2012, Jones sent an email to all the fire safety inspectors (including White), with a copy to Jones' superiors, explaining that to the extent inspectors were not issuing written citations for observed violations, that practice had to stop as it created potential liability to the City and the fire department and was a "great disservice to the public." Doc. 23, Ex. D, Attach. 3. In the email, Jones told inspectors that "it is imperative that, if a business has fire code violations, we must document them accordingly, issue a 'failure' on the inspection, and schedule a re-inspection to validate compliance." Id. No inspector contacted Jones to discuss the email. Doc. 23, Ex. D at ¶ 17. White acknowledged having received the March 12,

4

2012 email and interpreted it as an order from his superior officer. Doc. 23, Ex. A at Tr. 39-40, 45- 46.

Jones did not notice significant improvement and on April 16, 2012, he sent another email to all of the fire safety inspectors, including White, again copying his superior officers. Doc. 23, Ex. D, Attach. 4. The April 16 email reiterated the information from the March 12 email but struck a far more serious tone, telling inspectors that each of them "is required, by law, to document fire code violations;" that observed violations "must be written" and "must be entered into the computer;" that an inspector's "[f]ailure to do so will be viewed and treated as willful negligence of duty and/or incompetence;" that observing a violation but recording the property as having passed the inspection "could and would be viewed as falsifying official documents and/or public records." Id. In the email, Jones told the inspectors of his concern that the low number of violations vis-a-vis the total number of inspections was indicative of "misconduct," "caution[ing]" the inspectors to conduct themselves appropriately by documenting violations. Id. Jones closed the email with a warning that he "cannot and will not shield any form of incompetence, misconduct, and/or neglect of duty" and that appropriate disciplinary action would be taken if necessary. Id. Again, no inspector sought further clarification. Doc. 23, Ex. D at ¶ 18. White admitted he received the April 16, 2012 email and interpreted it as an order from his superior officer. Doc. 23, Ex. A at Tr. 49-50, 54.

5

A few weeks thereafter, while performing his quality assurance review of inspectors' recent records (in which he compared computer database records with billing forms), Jones noticed a discrepancy in the dates recorded for a fire extinguisher at a property White had inspected on April 23, 2012. Doc. 23, Ex. D at ¶ 20. Jones visited the property himself and discovered that White had passed the property even though its fire extinguisher, which White reported in the computer database as having an inspection date of April 2012, was last inspected in October 2009 and thus was years overdue for an inspection.[5] Id. at ¶ 21. In reviewing the inspection history for the property, Jones discovered that White had passed the same property on a prior occasion as well, notwithstanding the same expired extinguisher. Id. Jones decided to check White's other recent inspection records and visited the properties White had inspected since April 16 (the date of Jones' second email). Id. at ¶ 22. Jones discovered White had passed three other properties that had expired equipment, including fire extinguishers and a sprinkler system. Id. at ¶¶ 22, 23. In each case, White recorded in the computer database fire safety equipment inspection dates that were the same as the date White inspected the property (resulting in a

---

[5]As mandated by Florida's Fire Prevention Code, commercial fire safety equipment is maintained on a periodic basis (generally annually) by private companies who tag the equipment with the month and year of the maintenance inspection. JFRD fire safety inspectors do not themselves test the equipment but record the date noted on the tag. Property owners are deemed in violation if their equipment has not been inspected in accordance with the Code. Doc. 23, Ex. D at ¶¶ 11-16.

passing inspection), when in fact the equipment inspection dates were years earlier. Doc. 23, Ex. D, Attach. 5. Jones had not seen a discrepancy like this in the records of any other inspector. Doc. 23, Ex. D at ¶ 20. Additionally, in some commercial blocks White reportedly had fully inspected, he had skipped over some businesses entirely, raising a suspicion in Jones' mind that White might be taking bribes. Id. at ¶ 23.

Jones summarized his findings in a May 8, 2012 "Rule Infraction Charges" issued to White. Doc. 23, Ex. D, Attach. 5. Being charged with a rule infraction is not itself discipline but is notification that discipline may be taken by the Director of JFRD. Doc. 23, Ex. D at ¶ 24. White submitted a rebuttal to the Rule Infraction Charges, explaining that the practice in fire safety inspections has always been that inspectors have the discretion to give verbal warnings to correct a violation for expired fire extinguishers. Doc. 23, Ex. D, Attach. 6. White explained that he has a 98% compliance rate with property owners following up by fax or email to demonstrate compliance. Id. White calculated he had entered 4,607 inspection reports into the computer database between 2009 and 2012, and his compliance rate was good, but he wasn't perfect. Id. White questioned whether he was being singled out, noting that many buildings have expired equipment and other fire safety violations, yet no one else was being accused of fraudulent, unethical, incompetent or grossly negligent conduct. Id.

The Rule Infraction Charges and White's rebuttal were submitted to the JFRD Fire Chief, Martin Senterfitt, who determined that the matter involved possible criminal charges and so referred it to the State Fire Marshal, who then opened an investigation. Doc. 23, Ex. E at ¶¶ 9-12. Because of the seriousness of the charge and the State Fire Marshal's investigation, White could not perform inspections or work in the field during the pendency of the investigation and he was therefore assigned to a 40-hour week with Tactical Support. Id. at ¶ 13. In that position, White could not earn inspector's pay (about $100/month) or special assignment pay (9% of his regular salary), both of which he had been eligible for as a fire safety inspector. Id. Within weeks of being assigned to Tactical Support, White states he suffered a heart attack which he attributes to the stress of the State Fire Marshal investigation. He later returned to work.[6]

The State Fire Marshal assigned a detective to the case and assembled a team to reinspect properties inspected by White to compare with records White had submitted. Doc. 23, Ex. D at ¶ 32. At the request of the State Fire Marshal, Jones assisted with the investigation and prepared a report of the team's findings. Id. at ¶¶ 32-33. In his August 2, 2012 report, Jones recounted numerous instances where White recorded an expiration date that would result in a passing inspection when in

---

[6]Despite requests from the City, White did not provide any evidence about his heart attack or its relationship to his job other than his testimony. Doc. 23, Ex. A at Tr. 154-58.

fact the equipment had expired years earlier, including a May 7, 2012 inspection at a church where White reported that the fire alarm system and suppression hood were current as of May 2012 when in fact they had both expired years earlier and the fire alarm indicator lights stated the equipment was in "trouble" mode. Doc. 23, Ex. D, Attach. 8 at 4. Jones also reported his suspicions that White had tried to cover his tracks once the investigation began by erasing records from the computer database, a suspicion supported by an IT analyst who determined that White had accessed the relevant records the day after Jones issued the Rule Infraction Charges, though the IT analyst could not confirm that it was White who had erased them. Id.; Doc. 31, Ex. I at Tr. 83-84; Doc. 23, Ex. E at ¶ 11. As part of the investigation, the detective interviewed White who admitted that he put the wrong equipment inspection dates in the computer database, but said he did so to avoid reinspection of the properties (a service for which the City does not charge property owners, unlike original inspections, for which the City does charge), consistent with the practice under previous JFRD Chiefs who emphasized conducting new inspections. Doc. 23, Ex. E, Attach. 2, "Investigative Report" from State of Florida, Department of Financial Services, Division of State Fire Marshal, Bureau of Fire and Arson Investigations at 2.

The State Fire Marshal concluded the investigation and presented the case to the State Attorney's Office in mid-November 2012 for the possible filing of criminal

9

charges against White for falsifying records and culpable negligence, but the Assistant State Attorney assigned to the matter determined not to prosecute, advising that it should be handled as a disciplinary matter. Doc. 23, Ex. F, Attach. 3 & 4. At some point thereafter, the State Fire Marshal advised JFRD that White had been "exceptionally cleared" of the charges, a finding that indicated there were circumstances outside the Fire Marshal's control (that being the State Attorney's decision) which prevented prosecution. Doc. 23, Ex. F at ¶ 9. As explained by the lieutenant who led the State Fire Marshal's investigation, the finding of "exceptionally cleared" "[was] not an expression of praise" for White's actions, and the Assistant State Attorney's decision did not adjudicate "White's guilt or innocence." Id.

JFRD decided not to pursue discipline, Wilson met with White, received his assurance that he was prepared to perform inspections in compliance with the applicable codes, and White returned to his former position as a fire safety inspector, effective January 23, 2013.[7] Doc. 23, Ex. E at ¶ 14; Doc. 23, Ex. E, Attach. 5. White requested retroactive special assignment and inspector pay for the seven months he was unable to work in the Fire Prevention Division (an amount Wilson calculated to be $3,636.64) but JFRD denied his request because the reassignment had been justified in light of the State Fire Marshal's findings. Doc. 23, Ex. E at ¶ 15.

---

[7]White claims JFRD did not inform him that the investigation had concluded and he only learned of it because he asked, but it's not clear when the State Fire Marshal notified JFRD. See Doc. 31, Ex. J at Tr. 21, 27.

In June 2012, while assigned to Tactical Support, White filed charges with the EEOC claiming that JFRD discriminated and retaliated against him by removing him from the inspector position and referring the matter to the State Fire Marshal, citing a 2009 EEOC charge and 2011 federal lawsuit in which he and approximately twenty other plaintiffs sued the City for allegedly discriminatory promotion practices.[8] Doc. 23, Ex. B. Although White testified that it was "common knowledge" that he had filed the 2009 EEOC charge and was involved in the Smith lawsuit, he further admitted that he hadn't told anyone, Doc. 23, Ex. A at Tr. 132-35. Jones stated he not know about White's 2009 EEOC charge or of the Smith lawsuit.[9] Doc. 23, Ex. D at ¶ 41. Wilson said he did not know about White's 2009 EEOC charge and, although he was generally aware of the Smith lawsuit, he did not know White was involved.[10] Doc. 23,

---

[8]See Smith v. City of Jacksonville, Case No. 3:11-cv-345-J-32MCR. Though filed on April 12, 2011, the Smith suit is still an active case. It was stayed for several years while the parties engaged in global settlement efforts and while a related case (United States v. City of Jacksonville, Case No. 3:12-cv-451-J-32MCR (also before the undersigned)) took the lead role in litigating the promotion case. The parties in both of these cases (and a third) have recently entered into a Consent Decree, which the Court has provisionally approved and scheduled for a Fairness Hearing on December 19, 2018. See United States v. City of Jacksonville, Case No. 3:12-cv-451-J-32MCR, Docs. 369, 375. The Consent Decree does not affect the case sub judice and the Court is therefore proceeding to adjudication.

[9]At his June 2016 deposition, Jones testified that he had heard accounts in the media about a Department of Justice suit "in the last two or three years," which would have post-dated the events relevant to this lawsuit. Doc. 31, Ex. H at Tr. 32-33.

[10]When asked if he knew about the Smith case, Wilson testified that he generally knew from word of mouth that a group of individuals had brought suit against the City.

Ex. E at ¶ 17; Doc. 31, Ex. I at Tr. 35-36. After White returned to the Fire Prevention Division he amended his EEOC claim, adding that he had been exonerated from any wrongdoing and that the episode had interfered with his chance to be appointed to a Fire Marshal position for which he had applied in 2012.[11] Doc. 23, Ex. B. On February 10, 2014, the EEOC issued White his notice of right to sue (id.) and he timely filed this complaint on May 13, 2014.[12] The case is now before the Court on

---

Doc. 31, Ex. I at Tr. 34-36. In his brief, plaintiff claims Wilson likely knew of White's involvement in the Smith suit because Wilson gave a deposition in the related suit brought by the Department of Justice. Doc. 28 at 7. But Wilson testified that he had given that deposition in December 2015 or January 2016-- long after the events relevant to this lawsuit. See Doc. 31, Ex. J at Tr. 40.

[11]In his EEOC charge and complaint, White claims the State Fire Marshal's investigation caused him to miss a chance to be appointed to be the JFRD Fire Marshal in 2012 (Jones was appointed). But White applied for that position in 2011, not 2012. See Docs. 23, Ex. F & G. Moreover, White's application failed to demonstrate that he met the minimum qualifications to be considered for the promotion. Id.

[12]About six weeks after White filed this lawsuit, JFRD and other City departments were asked to test a GPS device to determine if the City wanted to purchase them. Doc. 23, Ex. D at ¶¶ 36-37. Jones (who was by then the Chief of the Fire Prevention Division) asked White, as his most senior inspector, to wear the device during the one week test. Id. White complained he was being singled out and Jones advised him that if the City wanted to test the device for longer than a week, he would give it to another inspector to test. Doc. 23, Ex. D, Attach. 9. Id. But the device did not work and the test was abandoned after only one or two days. Doc. 23, Ex. D at ¶¶ 36-37. White did not seek to amend his EEOC claim or his complaint but now cites the GPS incident as further evidence of discrimination and retaliation, claiming it should be considered in this case because it could be expected to "grow out of" the claims he did raise. Doc. 28 at 10-11. The City objects, noting that the GPS incident occurred in July 2014, nearly a year and a half after White returned to his previous position as a fire safety inspector– too remote in time and circumstance to be related to any of the

the City's motion for summary judgment.

## II. Standard of Review

"Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Trask v. Sec'y, Dep't of Veterans Affairs, 822 F.3d 1179, 1184, n.1 (11th Cir. 2016) (citing Fed.R.Civ.P. 56(a)). "A material fact is one that might affect the outcome of the suit under the governing law." Furcron v. Mail Centers Plus, LLC, 843 F.3d 1295, 1303 (11th Cir. 2016) (quotations and citation omitted). "A material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. (quotations and citation omitted). In making this determination, the Court "view[s] all of the evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." Id. at 1304

---

earlier activity. Doc. 31 at 3. The Court agrees. See, e.g., Mulhall v. Advance Sec., Inc., 19 F.3d 586, 589 n.8 (11th Cir. 1994) (explaining judicial complaint is limited by scope of EEOC investigation that can reasonably be expected to grow out of the charge). Moreover, even if White had amended his EEOC claim to include it, it would not save his case. The incident was inconsequential-- lasting at most for two days and having no serious or material affect on the terms, conditions, or privileges of White's employment. See, e.g., Crawford v. Carroll, 529 F.3d 961, 970-74 (11th Cir. 2008) (explaining adverse employment action standard for discrimination claims and for retaliation claims). Furthermore, the City articulated good and sufficient reasons for asking White to carry the device. See Doc. 23, Ex. D at ¶¶ 36; Doc. 23, Ex. D, Attach. 9. There is nothing but White's own self-serving conjecture that race or retaliation had anything to do with Jones' decision to ask White to wear the GPS for the brief test period. See Long v. McHugh, No. 1:13-cv-1577MHH, 2016 WL 4379430, *4 (N.D. Ala. Aug. 17, 2016) (disregarding plaintiff's conclusory statement that race must have been a consideration "because I am black").

(quotations and citation omitted).

**III. Discussion**

    **A.    Count I:    Retaliation and Retaliatory Harassment/ Hostile Work Environment**

Title VII "makes it unlawful for an employer to discriminate against any of [its] employees because the employee has opposed any unlawful employment practice or because of participation in a Title VII investigation or hearing."[13] Furcron, 843 F.3d at 1310 (citing § 2000e-3(a)) (internal quotations and brackets omitted). "A violation of the anti-retaliation provision can be established by direct or circumstantial evidence." Id. (citation omitted). Here, there is no direct evidence of retaliation.

In the absence of direct evidence, a plaintiff may establish a Title VII retaliation claim by circumstantial evidence using the McDonnell-Douglas burden shifting framework. Furcron, 843 F.3d at 1310 (citing McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973)). Under that framework, the employee must show "(1) the employee was engaged in statutorily protected activity; (2) the employee suffered an adverse employment action; and (3) a causal link exists between the protected activity

---

[13]Courts apply Title VII jurisprudence to claims brought under the Florida Civil Rights Act (Florida Statutes Chapter 760), Harper v. Blockbuster Entertainment Corp., 139 F.3d 1385, 1387 (11th Cir. 1998), so no separate analysis is needed for any alleged violation of state law.

and the adverse employment action." Id. (citations omitted).[14]

In the context of a retaliation claim, the "adverse employment action" is construed more broadly than in a discrimination claim. Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 61-67 (2006). To meet the standard, "the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." Id. at 57. The standard is "objective" to avoid judging the severity of the harm based on the employee's "subjective feelings," and it is flexible so as to account for the significance of the act in "the particular circumstances." Id. at 68-69.

"Title VII retaliation claims require proof that the [employer's] desire to retaliate was the but-for cause of the challenged employment action." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2528 (2013). "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Id. at 2533.

White's 2009 EEOC charge and status as a plaintiff in the 2011 federal lawsuit against the City are statutorily protected activity and the Court will assume (without

---

[14] If the employee can establish a prima facie case, "the employer may come forward with legitimate reasons for the employment action to negate the inference of retaliation." Furcron, 843 F.3d at 1310 (citations and quotations omitted). If the employer is able to do that, "the burden shifts back to the employee to demonstrate, by a preponderance of the evidence, that the employer's reasons are pretextual." Id. at 1310-11 (citations and quotations omitted).

15

deciding) that White suffered an adverse employment action when he was temporarily transferred from his position as a fire safety inspector to a position where he did not have the opportunity to earn as much money. What is missing, however, is a causal link between the two. First, neither Jones nor Wilson knew White was involved in the earlier protected activity. Doc. 23, Ex. D at ¶ 41 and Ex. E at ¶ 17. Second, even if they did, the 2009 EEOC charge and 2011 lawsuit occurred more than a year before White's inspections were reviewed. See Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007) (finding three months was too long to establish a causal connection in the absence of other evidence). Moreover, in April, 2012, Jones sent an email to the inspectors advising that the failure to properly document inspections was a violation of law. He warned the inspectors of the actions he would take if they did not follow his specific orders to document all violations. Jones' discovery just days later that White was putting false inspection data in the computer database required investigation and action, including reporting White's conduct to Jones' superiors who determined the State Fire Marshal should be notified.[15] That was the cause of White's reassignment. As a matter of law, there is simply no causal connection between White's 2009 and 2011 protected activity and JFRD's decision to refer the matter to

---

[15]It was the State Fire Marshal's decision (not JFRD's) that the reported actions mandated the opening of an investigation, thereby requiring that White be removed from his position as a fire safety inspector until the investigation concluded. See Doc. 23, Ex. E at ¶¶ 12 & 13.

the State Fire Marshal (with the result that White was transferred from his post once the State Fire Marshal determined to open an investigation). White cannot establish a prima facie case of retaliation.

For the same reason, White cannot establish a claim of retaliatory harassment or hostile work environment. White offered no evidence of harassment or hostile work environment that would support this claim beyond the evidence already considered (and rejected) as supporting his retaliation claim. Cf. Gowski v. Peake, 682 F.3d 1299, 1312 (11th Cir. 2012) (recognizing a cause of action for retaliatory hostile work environment where a severe and pervasive accumulation of actions would not have occurred but-for a retaliatory reason).

### B. Count II: Race Discrimination

White also contends that it was because of his race that JFRD referred him (and no one else) to the State Fire Marshal. White has no direct evidence to support this claim so the Court looks at whether circumstantial evidence supports it. Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th Cir. 2004). To establish a prima facie case of race discrimination using circumstantial evidence, White must show "(1) [he] belongs to a protected class; (2) [he] was subjected to [an] adverse employment action; (3) [his] employer treated similarly situated employees outside [his] classification more favorably; and (4) [he] was qualified to do the job." Id. at 1091

(citing, inter alia, McDonnell-Douglas, 411 U.S. at 802).[16]

White belongs to a protected class and the Court will again assume (without deciding) that he suffered an adverse employment action.[17] The Court will also assume White was qualified to do his job at the time he was relieved of his fire safety inspector duties and for the duration of the State Fire Marshal's investigation.[18] It's the third prong that prevents White from establishing a prima facie case. While White argues that he can point to comparators who were not similarly treated, he claims only that no other inspectors were cited for rules infractions or referred to the State Fire Marshal.[19] But White testified that he did not know and had no way to know about the inspection records submitted by other inspectors. Doc. 23, Ex. A at Tr. 139-40, 144-

---

[16]If the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the employment action, which, if satisfied, the plaintiff may rebut by showing that the proffered reason is mere pretext. McDonnell-Douglas, 411 U.S. at 802-804.

[17]While assigned to tactical support duties, White was ineligible to receive supplemental pay inspectors can receive. But the City plausibly claims this assignment was so temporary that it did not constitute an adverse employment action within the meaning of a Title VII claim of race discrimination. The Court need not decide the issue.

[18]The City argues that the criminal investigation precluded White from performing the job for the duration of the investigation, thereby rendering him unqualified to perform it.

[19]While White contends the SOG gives inspectors discretion whether to write citations for violations, in the face of the March 12, 2012 and April 16, 2012 emails from Jones, the inspectors' commanding officer, the inspectors had no discretion, as White himself admitted. See Doc. 23, Ex. A at Tr. 39-40, 45-56.

46. And Jones, the person who did know, testified that no other inspectors-- white or black-- violated the rule in the manner White did. Doc. 23, Ex. D at ¶ 20. Once Jones noticed the discrepancy, he can hardly be criticized for following through by inspecting properties White inspected (and ones he was supposed to inspect) and then bringing his disconcerting findings to the Fire Chief, Martin Senterfitt. White cannot demonstrate that similarly situated employees were treated more favorably by JFRD; he therefore cannot establish a prima face case of discrimination.[20]

Even if the Court assumes White could set forth a prima facie case, he cannot overcome the City's proffered reasons for taking the actions that it did. See Marria v. C.R. England, Inc., 679 F. App'x 844, 850 (11th Cir. 2017) (finding plaintiff could not create a disputed issue of fact as to pretext where he was engaged in workplace misconduct). White essentially disagrees with his employer's decision to change a prior practice and to require employees to conform their conduct accordingly (all after having given them notice in the sternest of terms). That does not make the decision discriminatory. See Wilson, 376 F.3d at 1088 ("If the proffered reason is one that might motivate a reasonable employer[,] . . . [q]uarreling with that reason is not

---

[20]White is correct that he need not satisfy the McDonnell-Douglas formulation of a prima facie case if he can alternatively "paint a convincing mosaic of circumstantial evidence" that would allow a jury to infer discrimination. Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328-29 (11th Cir. 2011). However, he does not suggest how he meets this test either. The Court has combed the record (even including the GPS incident) and finds that he cannot.

19

sufficient"). Nor is it evidence of discrimination that White was permitted to transfer back to his previous position without any discipline once JFRD received his assurance that he would obey his commanding officer and follow the law.

Accordingly, it is hereby

**ORDERED**:

Defendant City of Jacksonville's Motion for Summary Judgment (Doc. 23) is **GRANTED**. The Clerk is directed to enter judgment in favor of defendant City of Jacksonville and against plaintiff Marcel White and close the file.

**DONE AND ORDERED** at Jacksonville, Florida this 28th day of August, 2018.

_____
TIMOTHY J. CORRIGAN
United States District Judge

s.
Copies:

counsel of record